**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JASON ASHLEY BURD, by next** | ) | |
| **Friend and Executor of his estate,** | ) | |
| **JEREMY ANTHONY BURD,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | **No. 3:09-cv-0262** |
| **v.** | ) | **Judge Nixon** |
| | ) | **Magistrate Judge Brown** |
| **LEBANON HMA, INC., d/b/a** | ) | |
| **University Medical Center,** | ) | **JURY DEMAND** |
| | ) | |
| *Defendant.* | ) | |

<u>**ORDER**</u>

Pending before the Court is Defendant Lebanon HMA Inc. d/b/a University Medical Center's ("Defendant" or "UMC") Motion for Summary Judgment ("Motion") (Doc. No. 58), which was filed along with a Concise Statement of Undisputed Material Facts ("Statement of Undisputed Facts") (Doc. No. 58-1) and a Memorandum in Support ("Memorandum") (Doc. No. 59). Plaintiff Jeremy Anthony Burd ("Plaintiff"), as next Friend and Executor of the estate of Jason Ashley Burd, filed a Response to the Motion (Doc. No. 73), along with a Response to the Statement of Undisputed Facts (Doc. No. 76) and a Memorandum in Support of his Response to the Motion (Doc. No. 77). Defendant then filed a Motion for Leave to File Reply Memorandum (Doc. No. 79), which the Court **GRANTS**, along with a Reply Memorandum (Doc. No. 79-1).

For the reasons stated below, Defendant's Motion is **GRANTED.**

I.      BACKGROUND

   *A. Factual Background*

On March 22, 2008, Jason Ashley Burd was admitted to Defendant's emergency room after he attempted to commit suicide by hanging himself. (Doc. No. 77 at 2 (citing UMC Medical Records (Doc. No. 63) (filed under seal).) After finding that Mr. Burd had a high "Suicide Lethality" score, and that he tested positive for cocaine and opiates, Defendant involuntarily committed and transferred Plaintiff to a state mental health facility, Middle Tennessee Mental Health Institute ("MTMHI"). *Id.* at 2-3. At MTMHI, he was seen by psychiatrist Nasreen Mallik, who determined he posed no suicide risk and did not require admission to the facility, resulting his transportation back home. *Id.* at 3; (Doc. No. 59 at 5).

Subsequently, Mr. Burd's parents and brother (Jeremy Anthony Burd, Plaintiff in this action) visited his home, where Mr. Burd denied the suicide attempt and convinced them he was fine, so they left. (Doc. No. 59 at 6; Doc. No 77 at 4.) That evening, Mt. Juliet Police Officer Jason Cagle went to Mr. Burd's house to check on his condition. (Doc. No. 59 at 7; Doc. No. 77 at 4.) Officer Cagle found an outstanding warrant for Mr. Burd's arrest and, believing Mr. Burd to be a threat to himself and others and that he had consumed two bottles of vodka (as Mr. Burd so claimed), brought him back to Defendant's emergency room. *Id.*

Citing documents under seal in this case, both parties seem to agree that Officer Cagle had shared with hospital staff his belief that Mr. Burd might harm himself or others, but that Mr. Burd represented that this was a lie and that he only wanted to hurt the Officer. (Doc. No. 59 at 8-9; Doc. No. 77 at 5.) Mr. Burd was seen by Dr. Michael Crane (as well as Registered Nurse Heather Tomlinson), who determined that Mr. Burd was suffering from acute anxiety rather than experiencing an emergency medical condition such as a credible suicide threat, and that his condition was stable. (Doc. No. 59 at 8; Doc. No. 77 at 4-5.) The parties also appear to agree that Dr. Crane reviewed records pertaining to Mr. Burd's previous visit to UMC that day (Doc.

No. 59 at 8; Doc. No. 77 at 4), but Plaintiff asserts that Dr. Crane improperly failed to review MTMHI's file on Mr. Burd (Doc. No. 77 at 5).

Plaintiff alleges in his Amended Complaint, however, that during this second visit to UMC, the hospital "advised [Mr. Burd] that he could not afford treatment because he had no funds or insurance," and that "[h]e was advised to return after he made financial arrangements for treatment." (Doc. No. 5 at 5.) The Court has not been made aware of any evidence documenting when or by whom this statement was made, or even that it occurred at all. Instead, Plaintiff has suggested that hospital staff knew Mr. Burd did not have health insurance because this information was left blank on his admission chart, and because "the fact that Mr. Burd had been sent to MTMHI and not to a non-state psychiatric hospital told UMC that Mr. Burd did not have health insurance," citing the deposition of one of Plaintiff's experts. (Doc. No. 77 at 15.) Further, Plaintiff points to UMC's policies requiring a psychiatric consultation for any patient evaluated in the emergency room who is known or suspected to be suicidal and the request of a psychiatric consultation for patients who have attempted suicide. *Id.* at 8. Plaintiff asserts that the failure to order a consultation constituted a violation of hospital policy that indicates Mr. Burd's treatment was different from that of an insured patient. *Id.* at 8. Defendant, however, states that both Dr. Crane and Nurse Tomlinson have denied in depositions that financial matters played any role in their treatment of Mr. Burd. (Doc. No. 59 at 9-10.)

Ultimately, Mr. Burd was released with orders to follow up with his personal physician in two days. (Doc. No. 59 at 9; Doc. No. 77 at 5.) Early the next morning he committed suicide by hanging himself. (Doc. No. 59 at 11; Doc. No. 77 at 5.) He was found to have ingested alcohol, cocaine, and illegal steroids. (Doc. No. 59 at 11 (citing Mt. Juliet Police Records and Metro Nashville Police Department Fax (Doc. No. 63) (filed under seal)).)

*B. Procedural Background*

On March 17, 2009, the executor of Plaintiff's estate, Jason Anthony Burd, filed suit against Defendant, alleging violations of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA") (Doc. No. 1). The initial Complaint was amended on April 9, 2009 (Doc. No. 5), and Defendant filed an answer on May 15, 2009 (Doc. No. 8). A Case Management Order was issued on June 17, 2009, setting a Final Pretrial Conference for November 29, 2010, and Jury Trial for December 7, 2010. Magistrate Judge Brown permitted UMC to file an Amended Answer (Doc. No. 28) on February 2, 2010, and Defendant did so the same day (Doc. No. 29).

On August 9, 2010, Defendant filed this Motion (Doc. No. 58) along with its Concise Statement of Undisputed Material Facts (Doc. No. 58-1) and a Memorandum in Support (Doc. No. 59). UMC also filed on that date a number of sealed documents, including Mt. Juliet police records, UMC's medical records, and transcripts of depositions taken of UMC staff, Mr. Burd's family members, and expert witnesses. (Doc. Nos. 62 to 71.) Plaintiff filed a Response to the Motion (Doc. No. 73) on August 30, 2010, along with a Response to the Statement of Undisputed Facts (Doc. No. 76), a Memorandum in Support (Doc. No. 77). Plaintiff, too, filed a number of sealed documents, including excerpts of the documents mentioned above, depositions of additional expert witnesses, UMC policies, a copy of Mr. Burd's suicide note, and UMC's Emergency Department Patient Log. (Doc. Nos. 73-1 to 73-13; Doc. No. 75.) On September 27, 2010, Defendant filed its now-granted Motion for Leave to File Reply Memorandum (Doc. No. 79), along with a Reply Memorandum (Doc. No. 79-1).

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides in part that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The Advisory Committee for the Federal Rules has noted that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee's note.

Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 47 U.S. 242, 247-48 (1986). A genuine issue of material fact is one which, if proven at trial, would result in a reasonable jury finding in favor of the non-moving party. *Id.* The substantive law involved in the case will underscore which facts are material, and only disputes over outcome-determinative facts will bar a grant of summary judgment. *Id.* at 248.

While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 332 (1986). In ruling on a motion for summary judgment, the court must review the facts and reasonable inferences to be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Further, the Court will closely scrutinize the movant's papers while indulgently treating those of the opponent. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962) (citations omitted).

To determine if a summary judgment motion should be granted, the court should use the standard it would apply to a motion for a directed verdict under Rule 50(a) of the Federal Rules

of Civil Procedure. *Anderson*, 477 U.S. at 250. The court must determine whether a reasonable jury would be able to return a verdict for the non-moving party and if so, the court must deny summary judgment. *Id.* at 249. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989) (citations omitted).

## III.    ANALYSIS

The statute under which Plaintiff brings his claims, EMTALA, "requires emergency patients, treated in a hospital setting, to be screened and stabilized prior to their release." *Estate of Taylor v. Paul B. Hall Regional Medical Center*, No. 98-5052, 1999 WL 519295, at 1 (6th Cir. July 15, 1999). The statute was enacted by Congress "to prevent 'patient dumping,' whereby the poor and uninsured are released from emergency rooms without first receiving proper medical care." *Id.* (citing *Cleland v. Bronson Health Care Grp., Inc.,* 917 F.2d 266, 268 (6th Cir. 1990)). Its purpose was not, the Sixth Circuit has stated, to substitute for a state law cause of action for medical malpractice. *Id.* at 2.

In relevant part, 42 U.S.C. 1395dd(a) requires that a any individual who seeks treatment in a hospital's emergency room must be provided "an appropriate medical screening examination within the capacity of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists." Section 1395dd(b) requires that if the hospital determines an emergency medical condition exists, the patient must receive "such further medical examination and such treatment as may be required to stabilize the condition," or may be transferred to another facility once stabilized (with some limited exceptions). An "emergency medical condition" is one which "manifest[s] itself by acute symptoms of sufficient severity . . .

such that the absence of immediate medical attention could reasonably be expected to result" in serious risk or harm to the individual's health.  Section 1395dd(e)(1).

In its Motion, Defendant makes three arguments in favor of its entitlement to summary judgment on Plaintiff's EMTALA claims: (1) Plaintiff's screening claim under EMTALA must fail because Plaintiff has put forth no proof that UMC acted with an "improper motive" in screening Jason Burd; (2) Plaintiff's stabilization claim under EMTALA must fail because Plaintiff has put forth no proof that UMC had actual knowledge that an emergency medical condition existed when it discharged Jason Burd; and, (3) even if Plaintiff could move forward with either of these alleged EMTALA violations, he has not established a causal link between Defendant's conduct and Plaintiff's damages.

### A.  Plaintiff's Screening Claim Under EMTALA

Defendant argues first that a plaintiff must establish that UMC had an "improper motive" in its treatment of Mr. Burd to succeed in its screening claim, and that while Plaintiff did allege such a motive in the Complaint (that Mr. Burd was told by UMC he could not afford treatment and should return when he had made financial arrangements), he has come forth with no proof to support this allegation.  (Doc. No. 59 at 14.)  Defendant states that in response to an interrogatory requesting a detailed statement of the acts or omissions on which this claim is based, Plaintiff offered no support for its allegations regarding improper motive.  *Id.*; Plaintiff's Interrogatory Responses (Doc. No. 60-1).  A subsequent deposition of Jeremy Burd revealed that he believed the statement UMC is alleged to have made to Jason Burd was supported by either medical or police records, but that such a statement was not conveyed directly to him or his parents.  (Doc. No. 59 at 15 (citing Deposition of Jeremy Burd (Doc. No. 69 at 113-14) (filed under seal).)  Defendant's review of the records in this case produced no support for this claim,

and depositions of Dr. Crane and Nurse Tomlinson indicated that neither of them had heard or made any statement to this effect to Mr. Burd. (Doc. No. 59 at 15.)

Plaintiff's Response does not assert an alternative source of the alleged statement to Mr. Burd regarding his ability to afford care, but instead argues, first, that requiring a plaintiff to demonstrate an improper motive is erroneous, and, second, that improper motive can be inferred in this instance. (Doc. No. 77 at 9-16.) The Court addresses each of these arguments in turn.

    i.    Validity of the "Improper Motive" Requirement

In *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990), the Sixth Circuit interpreted the term "appropriate" in § 1395dd(a) "to refer to the motives with which the hospital acts. If it acts in the same manner as it would have for the usual paying patient, then the screening provided is 'appropriate.'" *Id.* at 272. While noting that a subsequent Supreme Court case, *Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249 (1999), indicated that § 1395dd(b) had no such "improper motive" requirement, the Sixth Circuit restated in *Estate of Taylor* its position that § 1395dd(a) places a burden on the plaintiff to demonstrate an improper motive. 1999 WL 519295, at *2.

District courts within the Sixth Circuit have generally followed this precedent.[1] Defendant cites in particular *Garrett v. Detroit Med. Ctr.*, No. 06-10753, 2007 WL 789023 (E.D. Mich. March 14, 2007), where a judge in the Eastern District of Michigan granted summary

---

[1] *See, e.g.*, *Stringfellow v. Oakwood Hosp. and Medical Center*, 409 F.Supp.2d 866, 870-71 (E.D. Mich. 2005) (citing *Cleland*'s explanation of the term "appropriate" and granting motion to dismiss plaintiff's screening claim for failure to allege substandard treatment or an improper motive; noting also that claim for failing to order CT scan should have been brought in malpractice rather than under EMTALA); *Broughton v. St. John Health System*, 246 F.Supp.2d 764 (E.D. Mich. 2003) (citing *Cleland* for improper motive requirement and dismissing plaintiff's claim for failing to allege such a motive); *Newsome v. Mann*, 105 F.Supp.2d 610, 612 (E.D. Ky. 2000) (citing *Cleland* for improper motive requirement and granting summary judgment on screening claim for failure to allege an improper motive).

judgment in a case similar to this one. There, the court found that there was a genuine issue of material fact as to whether decedent, admitted to the emergency room of an "out of network" hospital, had been afforded substandard screening compared with the treatment afforded "in network" patients when doctors decided not to order certain testing after suspecting pulmonary embolism. *Id.* at *4. Summary judgment was appropriate, however, because although the hospital was aware it was "out of network" for decedent (likely meaning the hospital would receive fewer benefits for the patient's treatment) and transferred him at his insurer's request to another facility, no evidence had been put forth that the failure to order testing was motivated by his insurance status. *Id.* at *6.

Plaintiff responds that *Estate of Taylor* erroneously read the Supreme Court's decision in *Roberts* as supporting a requirement of proof of an improper motive to support a screening claim. (Doc. No. 77 at 9.) In fact, Plaintiff argues, the *Roberts* decision recognized that the improper motive requirement was unique to the Sixth Circuit, but declined to express an opinion on the matter as it was concerned with EMTALA's stabilization rule, § 1395dd(b). *Id.* at 10 (citing *Roberts*, 525 U.S. at 253). Further, Plaintiff argues that the reading of *Cleland* forwarded by UMC (and followed by a number of other courts in this district) is erroneous. *Id.* Plaintiff argues that the operative language in that case regarding screening was not that the term "appropriate" referred to a hospital's "motives," but the following sentence, which stated that screening was "appropriate" if it was the same as what would be provided to "the usual paying plaintiff." *Id.* at 10-11 (citing *Cleland*, 917 F.2d at 272). Plaintiff cites courts in other jurisdictions that have taken this view of *Cleland*. *Id.* at 11 (citing *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851 (4th Cir. 1994); *Correa v. Hosp. S.F.*, 69 F.3d 1184 (1st Cir. 1995)).

These arguments have been made before. In *Broughton v. St. John Health System*, 246 F.Supp.2d 764 (E.D. Mich. 2003), despite the plaintiff's allegations that the hospital had failed to adequately screen her in a number of ways, the district court found that her screening claim must be dismissed because she had failed to allege an improper motive. As in this case, the plaintiff in *Broughton* argued that *Roberts* did not approve and in fact cast doubt on the legitimacy of the improper motive requirement derived from *Cleland*. *Id.* at 770. The plaintiff in *Broughton* also argued that *Cleland* itself did not require a showing of an improper motive—rather, the term "appropriate" was to be assessed by measuring the hospital's actions against those it would normally take in the case of paying patient. *Id.* at 771.

This Court agrees with the court in *Broughton* that these arguments are persuasive, 246 F.Supp.2d at 770-71, but must maintain, as the *Broughton* court did, that it is for the Sixth Circuit, not the district courts, to alter the improper motive requirement it established in *Cleland* and forwarded in *Estate of Taylor*. *See also Newsome v. Mann*, 105 F.Supp.2d 610, 611 n.1 (E.D. Ky. 2000) (rejecting argument that *Roberts* overruled the Sixth Circuit's "improper motives" requirement and concluding that, instead, the Supreme Court had left this governing precedent untouched).

Plaintiff's citation to two cases decided after *Cleland* and *Estate of Taylor* that appear to buck the trend does not compel the Court to take the bold step of rejecting Sixth Circuit precedent. In *Kiser, ex rel. Austen v. Jackson-Madison County General Hosp. Dist.*, No. 01-1259, 2002 WL 1398543 (W.D. Tenn. May 3, 2002), a court in the Western District of Tennessee held that EMTALA "sets forth a strict liability standard to the extent that § 1395dd(a) contains mandatory language whereby a hospital 'must' provide for medical screening if a request is made." *Id.* at *3. The court further explained that "[l]iability is strict in the sense that

10

the hospital need not have an evil motive or knowledge that the patient has an emergency medical condition to be held liable . . . ." *Id.* To support this approach, the court followed not Sixth Circuit precedent, but instead two cases from the Tenth Circuit—*Abercrombie v. Osteopathic Hosp. Founders Ass'n*, 950 F.2d 676 (10th Cir. 1991) and *Stevison v. Enid Health Sys., Inc.*, 920 F.2d 710 (10th Cir. 1990). *Kiser* was followed by another judge in the Western District of Tennessee in *Card v. Amisub (SFH) Inc.*, No. 03-2528 MI/AN, 2006 WL 889430 (W.D. Tenn. March 30, 2006). Although both of these cases are "post-*Cleland*," as Plaintiff asserts, their failure to take into consideration the holdings of *Cleland* and *Estate of Taylor* as to the meaning of an "appropriate" screening significantly diminishes their persuasiveness. This Court will not adopt the "strict liability" approach, and instead resolves that it is bound by the Sixth Circuit's improper motive approach in assessing Defendant's Motion.

ii.     Existence of Proof of an Improper Motive

Having determined that proof of an improper motive is required to support a screening claim, the Court must now assess whether, viewing the facts in the light most favorable to Plaintiff, Defendant has established sufficiently that no genuine dispute of material fact exists such that it is entitled to summary judgment. Plaintiff may defeat Defendant's Motion by pointing to material facts that are in dispute or that entitle him to judgment, but a response that simply asserts that a jury might find Defendant's evidence unpersuasive or incredible is not enough to defeat the Motion. *See Fogerty v. MGM Grp. Holdings*, 270 F.3d 349, 543-54 (6th Cir. 2004).

As described above, *see supra* Part III.A, Defendant's chief argument is that despite Plaintiff's allegation in the Amended Complaint that Mr. Burd was told he could not afford treatment and should return when he had made financial arrangements, Plaintiff has provided

support for neither this allegation nor any other evidence of UMC's improper motivation. Plaintiff argues that if an EMTALA screening claim requires a showing of improper motive, his claim still survives summary judgment because it is undisputed that "UMC had a mandatory policy regarding psychiatric consultation and Mr. Burd did not receive it." (Doc. No. 77 at 15.) Asserting that discovery was not complete at the time the Response was filed, Defendant also argues that additional evidence would provide "even greater proof that UMC's second screening of Mr. Burd was not similar to screenings given to insured patients." *Id.* Further, Plaintiff states that, based on the deposition testimony of Dr. Kenner, emergency room staff at UMC would have known from reviewing Mr. Burd's medical file that he did not have health insurance. *Id.*

Defendant points out that Plaintiff provides no support of the claim that Mr. Burd was told he should return to the hospital when he had made financial arrangements—rather, Plaintiff asserted in its Response to the Statement of Undisputed Facts that what Dr. Crane and Nurse Tomlinson heard and said should be weighed by a jury. (Doc. No. 79-1 at 2 (citing Doc. No. 76 at 1-5)). Defendant also notes that both Dr. Crane and Nurse Tomlinson were deposed under oath, and Plaintiff's counsel had an opportunity for cross-examination. (Doc. No. 79-1 at 3.) Each testified that they had no animus or improper motive toward Mr. Burd, and that they found his denials of suicidal intentions convincing, leading to his release. *Id.* at 4. The Court agrees with Defendant, citing *Fogerty*, that Plaintiff may not survive a motion for summary judgment simply by saying that a jury might not believe Defendant's witnesses. A party may not simply "recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Fogerty*, 379 F.3d at 354 (quoting *Curl v. Int'l Bus. Machs. Corp.*, 517 F.2d 212, 214 (5th Cir. 1975).

Plaintiff's assertions in the Response do not constitute adequate contestation of Defendant's proof. As to the allegation that UMC had a policy requiring psychiatric consultation that hospital staff improperly failed to apply to Mr. Burd, the Court is not convinced as an initial matter that this policy should have applied to Mr. Burd. The policy, which states that a psychiatric consultation must be provided for any patient evaluated in the Emergency Room who is "known or suspected to be suicidal," and that one must be "requested for and offered to, all patients who have attempted suicide or have taken a chemical overdose." When Mr. Burd was first seen in the UMC emergency room after actually attempting suicide, he was involuntarily committed and provided a psychiatric consultation by Dr. Mallik at MTMHI. *See supra* Part I.A. At his nighttime visit to the emergency room, however, he was assessed not to be suicidal but to have acute anxiety, *id.*, and, further, he had already been evaluated by a psychiatrist in relation to the initial attempt. It would seem to the Court that this policy was followed, even if it is the case that Dr. Crane's assessment was sorely mistaken.

Even assuming that Mr. Burd was treated in a manner different from that prescribed by policy, or from that afforded to patients with insurance, the Court is still persuaded by Defendant's argument that no genuine issue of material fact exists as to the matter of improper motive. As mentioned above, both Dr. Crane and Nurse Tomlinson have disavowed any improper motive in their depositions, and Dr. Crane specifically denied knowing Mr. Burd's insurance status. (Doc. No. 59 at 8-9) Plaintiff does not contest that this was the testimony given, but instead asserts in its Response to the Statement of Undisputed Facts that what these individuals did and said should be weighed by the jury. (Doc. No. 76 at 1-5.) Plaintiff's proof amounts to the allegation that Mr. Burd's treatment in his second visit to UMC may not have been in line with UMC policy, and that it is likely—according to an expert witness—that UMC

staff knew of his insurance status, though they deny either having this knowledge or taking it into consideration. All that Plaintiff offers beyond this is that a jury may not find these individuals credible, and that further discovery was to take place—a deposition of another of Defendant's experts and possible stipulation as to UMC's medical reports regarding similar cases (Doc. No. 77 at 1.) As stated above, this first offering is not adequate to survive summary judgment, and as to further discovery, Plaintiff made no further filings after its Response, and the evidence he proposes simply appears to be more of the same, so to speak.

While Plaintiff has established a genuine issue of material fact as to whether Mr. Burd's treatment was substandard, he has not put forward evidence or otherwise demonstrated that a dispute exists as to UMC's improper motive. *Garrett v. Detroit Med. Ctr.* is instructive on this point. There, the court granted summary judgment on a plaintiff's screening claim because, despite the existence of a genuine dispute as to a material fact regarding the quality of the patient's treatment, all the plaintiff had shown in terms of improper motive is that the hospital was aware that the patient was "out of network." No. 06-10753, 2007 WL 789023, at *5-6 (E.D. Mich. March 14, 2007). As in *Garrett*, Plaintiff here was screened (as he had been earlier that day and then sent to MTMHI), and no evidence has been put forth that he would have been screened differently but for his financial or insurance status. *See id.* at *6. Rather, the evidence drawn from discovery in this case indicates that the individuals who saw Mr. Burd at UMC disavow any improper motive—a claim that Plaintiff only challenges by stating this is a matter of credibility.

The improper motive requirement in the Sixth Circuit creates a difficult burden for plaintiffs bringing suit under EMTALA, and it is one Plaintiff here is unable to meet on the

evidence before the Court. For the reasons stated above, Defendant's Motion as to Plaintiff's screening claim is **GRANTED.**

### B. *Plaintiff's Stabilization Claim Under EMTALA*

Defendant argues that Plaintiff's stabilization claim under EMTALA must also be dismissed because there is no genuine issue of material fact as to whether anyone at UMC had actual knowledge that Mr. Burd presented an emergency medical condition on the night of March 22, 2008. (Doc. No. 59 at 20-21.) Defendant argues that deposition testimony of hospital staff on duty at UMC indicates that none of them had actual knowledge that Mr. Burd was suicidal, and that one of Plaintiff's experts' deposition testimony also concludes that UMC did not have actual knowledge of this condition. *Id.* Even if Plaintiff's experts believe that more should have been done for Mr. Burd, Defendant argues, that is not enough to support an EMTALA claim—the statute does not hold hospitals accountable for conditions about which they are not aware or even should have been aware. (Doc. No. 59 at 21 (citing *Vickers v. Nash. Gen. Hosp.*, 78 F.3d 139, 145 (4th Cir. 1996).) Plaintiff responds that actual knowledge may be imputed to UMC from any of UMC's agents or employees, and that, in light of recent Sixth Circuit case law, Plaintiff has put forth adequate proof that UMC's agents and employees had knowledge that put UMC on notice that Mr. Burd had an emergency medical condition on the night of March 22, 2008. (Doc. No. 77 at 16-18.)

Unlike under § 1395dd(a), a plaintiff raising a claim under § 1395dd(b)—EMTALA's stabilization requirement—need not establish that a hospital possessed an improper motive in its treatment of a patient. *Roberts v. Galen of Virginia*, 525 U.S. 249, 252-53 (1999). What must be shown to trigger the stabilization obligation contained in § 1395dd(b), however, is that a hospital (including any of its agents or employees) had actual knowledge of that an emergency medical

condition existed.  *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 585 (6th Cir. 2009) (citing *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 786 (6th Cir. 2003)).

Plaintiff asserts that a hospital may be held liable for failing to stabilize a patient when medical records indicate that a patient has an emergency medical condition, even if hospital staff members deny that they knew of this condition.  (Doc. No. 77 at 16.)  Plaintiff bases this view on an unpublished 2010 decision of the Kentucky Court of Appeals (an intermediate appellate court), *Thomas v. St. Joseph Healthcare*, Nos. 2007-CA-001192-MR, 2007-CA-001244-MR, 2010 WL 2812967 (Ky. Ct. App. 2010).  The Sixth Circuit and district courts within the circuit have been clear in rejecting this approach.  In *Moses*, the Sixth Circuit expressly stated that "if [hospital staff members] do not believe an emergency medical condition exists because they wrongly diagnose the patient, EMTALA does not apply."  561 F.3d at 585; *see also Garrett v. Detroit Med. Ctr.*, No. 06-10753, 2007 WL 789023, at *6 (E.D. Mich. March 14, 2007); *Stringfellow v. Oakwood Hosp. & Med. Ctr.*, 409 F.Supp.2d 866, 871 (E.D. Mich. 2005).  Thus, only actual knowledge of an emergency medical condition on the part of UMC's staff—not simply the existence of facts that should have put Defendant on notice—triggers a duty to stabilize a patient pursuant to § 1395dd(b) of EMTALA.

As described in Part I.A, *supra*, it is undisputed Mr. Burd's diagnosis at his evening visit to UMC was acute anxiety and that his condition was deemed to be stable, resulting in his discharge from the hospital.  The parties also agree that Dr. Crane reviewed Mr. Burd's UMC medical chart from earlier on March 22, 2008.  Plaintiff does not dispute that Dr. Crane stated in his deposition that his diagnosis of Mr. Burd was "acute anxiety, situational to being arrested and taken to the emergency room"; that Dr. Crane stated in his deposition that he believed that Mr.

Burd's anxiety "would go away with the situation"; that Dr. Crane stated in his deposition that he "did not believe Mr. Burd was suicidal when he was examined"; that Dr. Crane stated in his deposition that Mr. Burd was "calm, reserved cooperative, pleasant, not angry (other than at being arrested), did not have any other issues, and was normal"; that Dr. Crane stated in his deposition that he "did not believe Mr. Burd was a danger to himself or others"; and that Dr. Crane stated in his deposition that he "did not believe Mr. Burd had an emergency medical condition." (Doc. No. 76 at 5-7.) Plaintiff states in response to each of Defendant's allegations that while the content of the deposition is undisputed, what Dr. Crane thought and believed is a matter for the jury to weigh. *Id.* Plaintiff responds in the same way to Defendant's assertions regarding Nurse Tomlinson (who testified in her deposition that she believed Mr. Burd was not a danger to himself and that he sincerely denied thoughts of suicide) and security officer Brent Morton (who interacted with Mr. Burd that night and testified in his deposition that Mr. Burd showed no signs he would kill himself). *Id.* at 7-10. Nonetheless, Plaintiff disputes that UMC had actual knowledge that Mr. Burd had an emergency medical condition on the basis that the threat of suicide is an emergency medical condition, Officer Cagle informed UMC staff that Mr. Burd had threatened to kill himself, and that UMC staff knew that Mr. Burd had come to the emergency room previously after a suicide attempt. *Id.* at 10.

The Court is not convinced by Plaintiff's claims that a dispute exists as to the material fact of whether Defendant had actual knowledge that Plaintiff had an emergency medical condition. Plaintiff relies heavily on *Moses*, in which the Sixth Circuit reversed a district court's grant of summary judgment to a hospital on an EMTALA stabilization claim. There, a patient was admitted from the defendant's emergency room exhibiting a variety of physical and psychological symptoms, which had led his wife to fear for her safety. 561 F.3d at 576. His

wife informed the hospital that the patient had told her that he had bought caskets, and he had tried to board a plane with a hunting knife. *Id.* Tests were performed, and one doctor's evaluation the next day indicated he believed an acute psychotic episode was yet to be ruled out. *Id.* Another doctor determined, two days later, that the patient was not medically stable and that, if the patient's insurance allowed, he should be transferred to a unit for patients who are acutely mentally ill. *Id.* The doctor's notes indicated that the patient was to be observed carefully for suicidal ideation, and suggested a possible diagnosis of atypical psychosis and depression. *Id.* Nonetheless, the next day, he was notified he would be discharged from the hospital after a third physician noted that he wanted to return home, presented a brighter affect and denied suicidality (though it was noted that his wife still feared him), and no longer had physical symptoms. *Id.* at 577. The final diagnosis was migraine headache and atypical psychosis with delusional disorder, and his discharge papers indicated that he could not stay at the hospital because he was medically stable. *Id.* He was released the next day, and ten days after that, the patient murdered his wife. *Id.*

In determining that the plaintiff's stabilization claim could proceed in *Moses*, the Sixth Circuit restated the rule that hospital employees or agents must have actual knowledge of a patient's emergency condition to trigger EMTALA obligations. *Id.* at 585. The court then distinguished the case before it from *Cleland*, where the Sixth Circuit had affirmed summary judgment for a hospital on the basis that doctors reasonably believed a patient was stable at the time of discharge: the patient was not in acute distress, neither the patient nor his family indicated that his condition was worsening, and no life-threatening risk was apparent. *Id.* at 586. The plaintiff in *Moses*, however, had put forth proof that called into question whether signs of stability asserted at the time of discharge actually existed. *Id.* First, the patient's diagnosis once

admitted—the "atypical psychosis" that led the examining physician, Dr. Lessem, to recommend he be admitted to care in a unit for the acutely mentally ill—was substantially the same as his final diagnosis. *Id.* Second, an expert opinion submitted by the plaintiff concluded that the symptoms described by Dr. Lessem could not have been resolved in one or two days, even though the patient was released the next day. *Id.* Third, Dr. Lessem's note indicating that the patient should be admitted to the unit for acutely mentally ill patients if his insurance allowed created a credibility issue as to whether hospital physicians actually believed no emergency condition existed when the patient was released. *Id.* There remained a question as to whether Dr. Lessem believed that the emergency medical condition had been stabilized, and as to whether the condition still existed at the time of the release and what the doctors believed at that time. *Id.*

Plaintiff appears to cite *Moses* primarily for the proposition that an EMTALA stabilization case may survive summary judgment when a doctor's credibility may be questioned as to whether an emergency medical condition existed. (Doc. No. 77 at 17.) Plaintiff emphasizes that he bears no burden at this stage to show that Mr. Burd was suicidal when he was released from UMC's emergency room, and Plaintiff again recites evidence that suggests UMC would have been "on notice" that an emergency medical condition existed. *Id.* at 18. The Court, however, is persuaded by Defendant's argument that this case is unlike *Moses*, and does not find that Plaintiff has put forward the sort of proof that enabled the plaintiff to survive summary judgment in that case.

First, unlike in *Moses*, the patient in this case, Mr. Burd, received a different diagnosis at his time of discharge (acute anxiety that Dr. Crane expected to lessen with the situation) from the one he had received in his earlier trip to UMC, where he was deemed to pose a suicide risk and was involuntarily committed, then released. Indeed, also unlike in *Moses*, Mr. Burd was not

under the continuous, week-long care of the hospital, but instead had been evaluated, transferred, and then deemed to be stable and appropriate for release before being returned to the hospital. Dr. Crane's decision to release Mr. Burd was in keeping with Dr. Mallik's assessment, which intervened between doctors' assessments of Mr. Burd's suicide risk in the morning and Dr. Crane's assessment in the evening.

Second, unlike in *Moses*, prior diagnoses by UMC or MTMHI staff did not indicate that Mr. Burd had a condition that could not have been stabilized by the time of his release, and Plaintiff does not assert that its experts have testified to such facts, either. The morning assessment at UMC was resolved by transferring Mr. Burd to MTMHI, and he was released because he was deemed not to pose a suicide risk—his condition was assessed to be stable. Dr. Mallik's assessment may have been gravely wrong (an issue to be determined under state malpractice law), but it provided an indication not that Mr. Burd was in need of further hospitalization, but that he was medically stable. As stated above, Dr. Crane's decision to release Mr. Burd was consistent with Dr. Mallik's assessment, as a psychiatrist, that Mr. Burd was appropriate for release.

Third, there is no suggestion that Dr. Crane disregarded another physician's assessment that further specialized psychiatric treatment should be provided if Mr. Burd's insurance permitted, or that such an assessment was still outstanding. Mr. Burd was transferred to MTMHI to resolve the suicide risk assessed by UMC staff in the morning, and Dr. Mallik's subsequent psychiatric evaluation of Mr. Burd resulted in his release, not a recommendation of admission for further observation. Significantly, Plaintiff in this case has not put forth substantial proof that Defendant considered Mr. Burd's insurance status in determining the course of his treatment,

whereas in *Moses*, evidence that insurance was a consideration appeared in the hospital's records.

Beyond these three points of distinction, Plaintiff's additional assertions do not call into question whether signs of stability asserted at the time of discharge actually existed, as the plaintiff was able to do in *Moses*. Plaintiff points to the morning UMC assessment of Mr. Burd indicating he was suicidal and the fact that Officer Cagle returned Mr. Burd to the hospital on the belief he was a danger to himself and others (which the officer made known to UMC staff). (Doc. No. 77 at 18-19.) Plaintiff argues that these facts create circumstantial evidence that Mr. Burd had an emergency medical condition, and that they put UMC on notice of this condition. *Id.*.

Evidence of the circumstances surrounding Mr. Burd's evening visit to UMC, and challenges to the credibility of hospital staff before the jury, are far less compelling here than in *Moses*. Here, in addition to medical records, the parties have also submitted depositions of almost every individual involved in this case, which has provided an opportunity for Plaintiff to cross-examine relevant UMC staff members. All have denied actual knowledge that Mr. Burd was suicidal, and instead stated in their depositions that they believed he was safe, which Plaintiff does not deny. *See supra* pp. 16-17. Although it is true that a jury might not find these witnesses credible, this situation is not the same as that in *Moses*, where certain medical information suggested that the patient might not have been stable and the defendant appeared not to come forth with any direct evidence (such as deposition testimony) disavowing actual knowledge. 561 F.3d at 586. Without sworn testimony, as here, indicating that the evidence the plaintiff asserted had been considered and that actual knowledge of an emergency medical

condition was still denied, it would seem prudent to allow a case to go to a jury to assess the inferences in play.

Here, however, Plaintiff has already had the opportunity to examine UMC's staff members and confront them with its factual allegations, but cites nothing in their depositions indicating that actual knowledge of an emergency condition existed at the time of Mr. Burd's evening visit to the emergency room.[2] UMC staff members appear to have considered the evidence Plaintiff puts forth that might have created knowledge that Mr. Burd was threatening suicide, but to maintain that they were convinced that he was stable and suitable for release. Indeed, one of Plaintiff's expert witnesses even admitted in his deposition that UMC lacked actual knowledge of an emergency medical condition. (Doc. No. 59 at 21 (citing Deposition of Dr. Lawrence G. Wilson (Doc. No. 71 at 117) (filed under seal)).) It is quite possible that the evaluation performed on Mr. Burd on the night of March 22, 2008, was deficient in some (or even every) respect, and Plaintiff's experts have alleged as much. (Doc. No. 77 at 18-19 (citing Declaration of Dr. William D. Kenner (Doc. No. 73-1 at 15, 19) (filed under seal)).) But, as explained at the beginning of this section, EMTALA is not a substitute for state malpractice claims. A claim under § 1395dd(b) must demonstrate that a defendant has actual knowledge that an emergency medical condition exists, and the Court is not made aware of an exception for instances in which a defendant hospital's shoddy evaluation should have produced actual knowledge of an emergency medical condition, but did not.

The instant case is again comparable to *Garrett v. Detroit Med. Ctr.*, where the district court granted summary judgment on the plaintiff's stabilization claim. No. 06-10753, 2007 WL

---

[2] Plaintiff has included excerpts of sealed depositions of Dr. Crane and Nurse Tomlinson along with his Response (Doc. Nos. 73-11 & 73-12) but does not cite to them in this portion of the Response. Having reviewed them with respect to Plaintiff's stabilization claim, however, this Court finds that they do not detract from the deponents' assertions that they determined that Mr. Burd did not pose a threat to himself.

789023, at *6 (E.D. Mich. March 14, 2007). There, both doctors who had examined the patient had also testified that they did not have actual knowledge that the patient had the condition that ultimately killed him—pulmonary embolism—at the time of transfer, even though pulmonary embolism had been part of a differential (possible) diagnosis. *Id.* The court rejected the argument that medical staff should have conducted further tests before transferring him, which the court characterized as a claim that the hospital should have known about the patient's emergency condition. *Id.* Although this formed a classic medical malpractice claim, it was not a claim under EMTALA, because plaintiff failed to put forth evidence indicating that defendants had actual knowledge of the condition: "Inclusion in a differential diagnosis, which is a list of *possible* diagnoses, does not equate to a *determination* that a patient actually has a particular condition sufficient to support liability under EMTALA." *Id.* Here, too, it seems that UMC staff was aware of factors that might have led to the conclusion that Mr. Burd was suicidal—that he had been admitted for this reason earlier in the day, that Officer Cagle saw fit to return him to UMC—but concluded, as in *Garrett*, that no emergency medical condition existed. Without proof of actual knowledge, as opposed to proof of what was perhaps poor judgment, Plaintiff has not supported a claim of liability under EMTALA.

In sum, Defendant has met its burden of showing that there is no genuine issue of material fact as to UMC's actual knowledge of the existence of an emergency medical condition, and Plaintiff has not put forth sufficient proof to support his claim.

IV.    CONCLUSION

For the reasons stated above, Defendant's Motion is **GRANTED.**

It is so ORDERED.

Entered this the 23rd day of November, 2010.


JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT